IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 14-71-TUC-CKJ (CRP) |
| Plaintiff, | **REPORT & RECOMMENDATION** |
| vs. | |
| Roberto Carrillo-Bastida, | |
| Defendant. | |

Defendant, who is representing himself with the assistance of advisory counsel, has filed a Motion for Duress Instruction (Doc. 33) and the Government has filed a Response (Doc. 48). Defendant's Motion came on for hearing on April 23, 2014 where Defendant testified on his own behalf and no other evidence was presented. A transcript (Doc. 46) of the evidentiary hearing is forwarded to the District Court together with this Report and Recommendation. For the following reasons, the Magistrate Judge recommends that the District Court, after its independent review, grant Defendant's Motion (Doc. 33).

**DISCUSSION**

Defendant is charged with attempted illegal re-entry on or about December 12, 2013 at the port of entry in Nogales, Arizona, in violation of 8 U.S.C. § 1326, enhanced by 8 U.S.C. § 1326(b)(2). (Doc. 9). The Indictment alleges that Defendant was removed from the United States through Nogales, Arizona, on December 11, 2013, and the following day, December 12, 2013, he attempted to re-enter the United States at the Nogales port of entry. Defendant contends that he attempted to re-enter the United States under duress. He seeks

to present a duress defense at trial and requests that the Court instruct the jury on duress. (Doc. 33).

Generally, "[a] defendant is entitled to instructions relating to a defense theory for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Burt,* 410 F.3d 1100, 1103 (9th Cir. 2005) (citation omitted). "A mere scintilla of evidence supporting a defendant's theory, however, is not sufficient to warrant a defense instruction." *Id.*

"A defendant is not entitled to present a duress defense at trial or receive a jury instruction on duress unless the defendant makes a prima facie showing of duress in a pretrial offer of proof, [*United States v. Vasquez–Landaver*, 527 F.3d [798,]... 802 [(9thCir. 2008)]...or in evidence presented at trial, *United States v. Jennell*, 749 F.2d 1302, 1305 (9th Cir.1984)." *United States v. Ibarra-Pino,* 657 F.3d 1000, 1004 (9th Cir. 2011). To state "a prima facie showing for a duress defense or a jury instruction, a defendant must establish: '(1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) lack of a reasonable opportunity to escape the threatened harm.'" *Id.* (quoting *Vasquez–Landaver*, 527 F.3d at 802).[1]

---

[1] As the government points out (Doc. 48, p. 3), the Ninth Circuit's model jury instruction on duress states, in pertinent part:

> The defendant must prove [duress] [coercion] [compulsion] by a preponderance of the evidence. A preponderance of the evidence means that you must be persuaded that the things the defendant seeks to prove are more probably true than not true. This is a lesser burden of proof than the government's burden to prove beyond a reasonable doubt each element of [specify crime charged].
>
> A defendant acts under [duress] [coercion] [compulsion] only if at the time of the crime charged:
> 1. there was a present, immediate, or impending threat of death or serious bodily injury to [the defendant] [a family member of the defendant] if the defendant did not [commit] [participate in the commission of] the crime;
> 2. the defendant had a well-grounded fear that the threat of death or serious bodily injury would be carried out; [and]

1  Defendant testified that in the summer of 2013, in Nogales, Sonora, he told teenagers
2 whom he saw running errands for the drug cartels that "it wasn't the way to go,...for them...
3 to look for a better way to life." (Tr. at pp. 8-9). The "mafia didn't take me kindly, me
4 giving that kind of advice to these kids. So they start, first, threatening me. Then one night,
5 on the–I think it was July, the last day of July to August 1st, they pick me up, took me to
6 a...house, to security house. They beat me down. After they did that, they took me to the
7 border and they told me it was better off for me to leave Nogales–Nogales Sonora, or else
8 I will be killed." (*Id.* at p. 9). Upon crossing into the United States, Defendant told his "side
9 of the story" to Customs and Border Protections ("CBP") officers. (*Id.*). He was referred
10 to ICE Florence and he began to seek asylum based on his experience with the mafia, whom
11 he also referred to as "sicarios". (*Id.*). After several months, Defendant's request for asylum
12 was denied due to his criminal history and he was ultimately deported through the Nogales
13 port of entry on December 11, 2013. (*Id.* at pp. 10, 14-16).

14  Upon arrival in Nogales, Sonora, on December 11, 2013, Defendant walked to his
15 sister's home in the morning hours. (*Id.* at pp. 10, 16-17, 24; *see also id.* at pp. 18-19
16 (Defendant was at his sister's until approximately 6:15 p.m.)). "That afternoon, the same
17 people, they had threatened me and beat me down on–on that prior time, they were already,
18 you know, there going around....I'm a human. You know, I fear for my life...." (*Id.* at p. 11).
19 The men drove by Defendant's sister's home in late model trucks at approximately sometime
20 between 3:00 and 4:30 that afternoon. (*Id.* at pp. 19). Defendant, who remained in the "front

---

> 3. the defendant had no reasonable opportunity to escape the threatened harm[.] [; and]
> [4. the defendant surrendered to authorities as soon as it was safe to do so.].
>
> If you find that each of these things has been proved by a preponderance of the
> evidence, you must find the defendant not guilty.

9th Cir. Model Crim. Jury Instr. 6.5 (Duress, Coercion or Compulsion (Legal Excuse)). The comments to the model jury instructions note that "[t]he fourth element should be used only in cases of prison escape." *Id.* (citation omitted).

- 3 -

1  of the house", heard the men's voices "making terrible threats...like you better leave,
2  punk...." and "[y]ou better...get out of town." (*Id.* at pp. 20-21). Defendant testified that he
3  had seen the men before and although he did not know their names, he knew their nicknames.
4  (*Id.* at p. 20). Defendant testified that the men had weapons.[2] (*Id.* at p. 13).

5  When Defendant was asked how the men would have known he was at his sister's
6  home, he responded that he had made inquiries during the day with friends and family about
7  his situation. (*Id.* at p. 19). "I don't know if one of the neighbors is going [sic] and tell them
8  that I was around, or I don't know how they got the word that I was back there." (*Id.* at p.
9  21; *see also id.* at p. 22 (Defendant did not see the men between the time he left the port of
10 entry and arrived at his sister's home)).

11 At about 6:15 p.m., Defendant left his sister's to go to the home of his friend, where
12 he spent the night in a car. (Tr. at pp. 18-19, 21-22). The next morning, Defendant rode the
13 bus to "a couple of...parks" where he considered what he should do. (*Id.* a p. 23; *see also* p.
14 27). "I used the day to analyze myself, if I have other avenues to choose....I was fear [sic]
15 for my life to go to the only family that knows me, my sister [sic] house, because I have fear
16 for my life. I knew that I could not get there in the daytime....I didn't have no – no other
17 means available to me." (*Id.* at p. 27). Defendant had "no money to travel south or to leave
18 the city...I don't have...immediate family that can take me nowhere or provide me with a
19 means for me to leave, or to go hide somewhere....[T]he only thing that I had was to come
20 back and seek custody, some kind of custody in this country." (*Id.* at p. 13; *see also id.* at
21 p. 26). Defendant further stated: "I have no means to leave the country–the city, I mean, to

---

[2]The record is not entirely clear that Defendant saw the weapons on December 11, 2013.  After Defendant initially testified on direct examination, the following exchange occurred:
    THE COURT:  And did–were these people–did they have weapons?
    [Defendant]:   Yes, they do have weapons.
    THE COURT:   ...did you actually see the weapons?
    [Defendant]:    Yes, I have.
(Tr. at p. 13).

- 4 -

1 go nowhere because I didn't – I mean, Nogales is not like the United States where you can 2 find help. I mean, if I went around to the police, it is more likely than not that they would 3 have turned me over to the same people that was [sic] after me. That's the reason I–I could 4 not go to the police and request help from them." (*Id.* at p. 26). Defendant "didn't see no 5 other means....My intention was never to reenter...." (*Id.*).

6 After making up his mind, Defendant left the park and proceeded directly to the 7 Nogales port of entry. (*Id.* at p. 11). Defendant told the officers he was on "federal 8 probation....I seek custody, some type of custody, rather than just being directed to go back 9 to Nogales on that same night." (*Id.*). Defendant testified that CBP Supervisor Meza knew 10 him and was going to direct him to asylum proceedings, but Defendant thought there was no 11 sense in that given his prior denial of asylum. (*Id.*). He was told: "you have to tell me that 12 you don't fear going back to Mexico tonight. I said, well, if that's what it takes, I don't fear 13 going back to Mexico." (*Id.*). Defendant also testified that after being "bombarded with 14 thousands of questions..." by six different officers, he was tired and "I'm just going to say 15 what [they] want to hear,....The only thing I didn't wanted [sic] was to be forced to be 16 returned to Mexico on that same day." (*Id.* at p. 12).

17 When Defendant was asked whether he gave the name "Corbaruvias (phonetic)", 18 when he arrived at the port of entry on December 12th, he responded: "No. That name pop 19 out when they fingerprint me....They ask me, have you used this name before, I said yes, 20 that's my a/k/a, one of my a/k/a's." (*Id.* at p. 22).

21 The government argues that Defendant failed to satisfy the first and third elements 22 necessary for the duress defense. The government contends that Defendant has failed to 23 establish an immediate threat of harm because his testimony was that he was threatened at 24 his sister's on December 11th, but he did not present evidence of threats on December 12th, 25 the day he presented at the port of entry. (Doc. 48, p. 4). Thus, according to the government, 26 Defendant failed to show that the threat of harm he faced was present, immediate, or 27 impending. (*Id.* (citing *United States v. Contento-Pachon,* 723 F.2d 691, 694 (9th Cir. 1984)). 28 In assessing the first factor, the Ninth Circuit has looked for "evidence of a figurative gun

1 to [the defendant's]... head compelling his illegal entry." *Vasquez-Landaver,* 527 F.3d at 802
2 (citations omitted). "Our case law makes it clear that to be immediate, a threat must be
3 specific: 'A veiled threat of future unspecified harm will not satisfy this requirement.'...Put
4 simply, vague and undetailed threats will not suffice." *United States v. Kuok,* 671 F.3d 931,
5 948 (9th Cir. 2012) (quoting *Contento-Pachon,* 723 .2d at 694).

6 Had the only time these men threatened Defendant been on December 11th, then there
7 is a good argument that the threat made on that date that he had better leave town portended
8 some future harm as opposed to the specific, immediate harm required for the duress defense.
9 However, in this case, Defendant testified that he recognized the men who threatened him
10 on December 11th as the "same people..." (Tr. at p. 11) who had picked him up and beat him
11 before taking him to the port of entry in the summer of 2013 telling him that "it was better
12 off for me to leave...Nogales, Sonora, or else I will be killed." (*Id.* at p. 9). Upon the very
13 same day of his return to Mexico on December 11th, the same men tracked Defendant to his
14 sister's home and warned Defendant that he had "better...get out of town." (*Id.* at pp. 20-21).
15 Based on his past experience with these men, Defendant specifically knew first hand what
16 he would encounter if these men were able to pick him up once again.

17 That Defendant was able to evade the men and go to a friend's home where he spent
18 the night in a car and blend in during the following day at public parks, does not mean that
19 Defendant was free of any harm if he returned to his sister's home or if the men otherwise
20 found him. That the men would find him appears inevitable given Defendant's testimony that
21 he had no money and no where else, other than his sister's, to go. Such testimony also
22 addresses the government's position that Defendant failed to show that he had no reasonable
23 opportunity to escape the threatened harm. This is especially true given that the men had
24 shown up outside the home of Defendant's sister the day before. Further, Defendant stated
25 that he was unable to trust the police whom he believed were likely to turn him over to the
26 men who were threatening him. *See Contento-Pachon,* 723 F.2d at 693 (holding it was up
27 to the jury to decide whether it was reasonable for one in the defendant's position not to trust
28 the police).

1    According to the government, when Defendant presented at the port of entry on
2    December 12th, rather than seeking escape from the threat by reporting it, he instead stated
3    he was a United States citizen and gave a false name.  (Doc. 43, p. 4).  To the contrary,
4    Defendant states that upon arriving at the port of entry on December 12th, he reported that he
5    was in violation of federal probation and sought to be taken into federal custody.  He testified
6    that he did not tell authorities he feared returning to Mexico because he wanted to avoid
7    deportation (*i.e.,* impending return to Mexico) after failed asylum proceedings, a road he had
8    been down before.

9    **CONCLUSION**

10   The testimony before the Court is that Defendant previously sought asylum because
11   of physical violence inflicted upon him and threats that he would be killed if he did not leave
12   the country made by the same men whom he claims threatened him again on December 11,
13   2013, the day he returned to Mexico after his failed attempt at asylum.  The following day,
14   December 12, 2013, in fear of the harm, Defendant, who knew from past experience what
15   the men were capable of and having no where else to go, returned to the United States
16   seeking federal custody for violation of his federal probation.  On the instant record
17   Defendant's contention that he was in fear of an immediate threat of harm from which he
18   could not escape absent illegal re-entry is supported by sufficient evidence to present a triable
19   issue of fact.  *See e.g., Kuok,* 671 F.3d at 949 ("In short, the ultimate factfinders may or may
20   not accept Kuok's story, but he has alleged facts sufficient to present his defense to the
21   jury.").  Consequently, Defendant's Motion should be granted to the extent that Defendant
22   should be permitted to present evidence of duress to the jury.  The decision whether the jury
23   should be instructed on duress is premature at this point and is more appropriate for
24   determination at trial.

25   **RECOMMENDATION**

26   For the foregoing reasons, the Magistrate Judge recommends that the District Court,
27   after its independent review, grant Defendant's Motion for Duress Instruction (Doc. 33) to
28   the extent that Defendant should be permitted to present evidence of duress to the jury;

- 7 -

whether the jury should be instructed on duress is a matter that should be determined at trial.

Pursuant to 28 U.S.C. §636(b), the parties have **fourteen (14) days** from the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court. Any Objections and Responses to Objections filed should be filed as **CR 14-71-TUC-CKJ**. No Replies shall be filed unless leave is granted from the District Court.

Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver of the right to review.

DATED this 14th day of May, 2014.

*/s/ Charles R. Pyle*

CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE